UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HILLCREST PROPERTY, LLP,

    Plaintiff,

v.                                            CASE NO.: 8:10-cv-819-T-23TBM

PASCO COUNTY,

    Defendant.
_____/

## ORDER

The plaintiff sues (Doc. 1) pursuant to 42 U.S.C. § 1983 and state law based on the defendant's allegedly "extortionate, unconstitutional, and illegal" roadway exaction; comprehensive plan policy; and unwritten custom, policy, and practice. The defendant moves (Doc. 8) to dismiss, and the plaintiff responds (Doc. 10) in opposition.

### Background

In April, 2001, the plaintiff (the "landowner") purchased sixteen and a half acres of undeveloped, commercially zoned property located northwest of Old Pasco Road and State Route 52 in Pasco County, Florida. The landowner intended either to develop the property or to sell the property for retail commercial development. The landowner applied for and received from the defendant (the "County") an approval permitting 147,000 square feet of commercial development on the property. In connection with the approval, the landowner submitted a "traffic study" that analyzed "the anticipated traffic generation of the proposed commercial development." Based on the traffic study, the

County issued to the landowner a "traffic concurrency certificate" that reserved to the landowner "the roadway capacity on [State Route] 52 necessary to accommodate [the landowner's] proposed development . . . ." In December, 2006, the landowner submitted to the County a specific "preliminary site plan" to develop an 83,000 square-foot retail shopping center and three "commercial out-parcels" on the property. The preliminary site plan proposed approximately half the amount of commercial development both initially approved by the County in April, 2001 and supported by the traffic study of State Route 52.

Both the future land use and transportation components of the County's "comprehensive plan" provide for the maintenance and development of roadways to accommodate growth. Pursuant to the comprehensive plan, the County adopted a "Right-of-Way Preservation Ordinance" (the "Right-of-Way Ordinance") that provides "for the dedication and/or acquisition of right-of-way and transportation corridors" to facilitate the development and expansion of the County's roadways. The comprehensive plan describes State Route 52 and the surrounding property as (1) "not currently deficient," (2) "having an acceptable roadway level of service," (3) "needing to be [widened to four lanes] by 2025," and (4) qualifying as "a future 4-lane 'State [Roadway] Project' to which the County will 'contribute.'" Notwithstanding the fact that the comprehensive plan describes State Route 52 as "not currently deficient," the County, upon receiving the preliminary site plan, demanded the landowner's dedicating "fifty (50) feet of right-of-way for future [widening] of [State Route] 52." In March, 2007,

the County informed the landowner that the County would require an additional ninety feet, which requirement brought the dedication to a total of one hundred and forty feet.

Upon receiving the County's demand, the landowner contacted the Florida Department of Transportation ("FDOT") and requested that FDOT pay for the dedication. In April, 2007, the County informed the landowner that the County would not approve the preliminary site plan unless the landowner dedicated the one hundred and forty feet and revised the preliminary site plan accordingly. The landowner negotiated with both FDOT and the County and agreed (1) to create the right-of-way, (2) to dedicate to the County (pursuant to the Right-of-Way Ordinance) fifty feet at no cost to the County, and (3) to sell the remaining ninety feet to the County. The County agreed to both expedite review of the preliminary site plan and extend the duration of the landowner's traffic concurrency certificate. As another condition of approval, the County required the landowner to "design, permit[,] and construct the on or off-site drainage, floodplain compensation[,] and wetland mitigation facilities associated with the [widening] of [State Route] 52 at no cost to the County." The landowner revised the preliminary site plan, which the County approved.

In mid-2008, the landowner applied for a two-year extension of the traffic concurrency certificate issued in 2001. After a hearing on the request, the County refused to extend the certificate. The County "implicitly indicated that [the County] would not consider a further concurrency certificate extension unless a right-of-way acquisition agreement satisfactory to the County was reached." During the negotiation, the Florida legislature passed a bill that automatically extended the traffic concurrency

certificate. The negotiation reached an impasse as to the right-of-way acquisition agreement, and the County never compensated the landowner for the property dedicated pursuant to the Right-of-Way Ordinance.

The landowner sues and argues that the Right-of-Way Ordinance (1) "precludes or severely restricts use and development of property lying within a transportation corridor" and (2) "requires landowners seeking to develop property lying wholly or partially within a transportation corridor to dedicate or set aside such property indefinitely for future use as right-of[-]way at no cost to the County and without assurances of payment of full or just compensation . . . ." The landowner alleges that the dedication required under the Right-of-Way Ordinance (1) relates to no specific, immediate construction of a roadway improvement; (2) "amounts to a[] perpetual reservation of [a] right-of-way without regard to whether the improvement . . . [will] be constructed in the reasonably foreseeable future;" and (3) results from no individualized determination that the land and roadway improvement for which the dedication occurred reasonably relate "both in nature and extent to the traffic impact of the proposed development." The ordinance burdens a landowner with the task of both demonstrating that the required dedication is "excessive" and obtaining a dedication waiver, a variance, or compensation for the dedication. The County retains discretion to relieve the landowner of the obligation to dedicate land. In this instance, the required dedication (1) renders unusable the dedicated land, (2) eliminates the landowner's ability to develop "valuable commercial outparcels," (3) renders "useless" other portions of the property,

and (4) "blights the [p]roperty by freezing [the property's] use and depressing [the property's] value."

The landowner alleges that the County required the dedication (1) absent a substantial or "demonstrably clear and present" need to widen State Route 52, (2) absent a finding that the landowner's development would "so overburden existing public roads as to require . . . accelerated improvement," (3) even though the County contemplates no widening of State Route 52 in the near future, (4) even though the dedication lacks a rough proportionality to the traffic impact of the proposed development, (5) even though the dedication is "grossly disproportionate" to any impact, and (6) even though the need to widen State Route 52 is not attributable to the traffic generated by the proposed development.

Additionally, the landowner alleges that the County enforces "various unwritten or unadopted customs, practices[,] and policies, which have been approved or acquiesced in by the Board of County Commissioners, the County's final policymaking body." The customs include the County's conditioning land development approval on the landowner's (1) gratuitously dedicating a right-of-way for roads not appearing on, or exceeding the prescribed width set forth in, the "Corridor Preservation Map or Table;" (2) gratuitously providing to the County "roads and associated drainage, floodplain compensation[,] and wetland mitigation facilities;" (3) paying substantial unauthorized, excessive fees, "which are imposed even [if] the traffic impact of the proposed development does not trigger the need for such improvements;" (4) relinquishing

"transportation impact fee credits;" and (5) agreeing to submit to future regulations imposing "additional roadway exactions."

The landowner sues (Doc. 1) pursuant to both 42 U.S.C. § 1983 ("Section 1983") and state law and seeks damages for (1) a taking in violation of the Florida Constitution; (2) a taking in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution; (3) a "temporary taking" in violation of the landowner's rights under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments; and (4) a temporary taking in violation of the landowner's rights to equal protection and due process under the Florida Constitution.  Additionally, the landowner asserts a facial challenge to both the County's comprehensive plan policy and the Right-of-Way Ordinance under (1) the Fifth and Fourteenth Amendments to the U.S. Constitution and (2) the Florida Constitution.

## Discussion

The County moves (Doc. 8) to dismiss based on (1) the failure to exhaust administrative remedies, (2) ripeness, (3) the landowner's lack of membership in a "suspect class," and (4) a lack of standing.

### *1. Exhaustion of Administrative Remedies*

The County argues that "[t]his action is not ripe," because the landowner failed (1) to apply for either a "dedication waiver" or a variance, (2) to appeal to the Board of County Commissioners, or (3) to allege sufficiently the futility of attempting to secure either a variance or relief through some other administrative remedy.  In response, the landowner argues (1) that a claim under Section 1983 requires no exhaustion of

- 6 -

administrative remedies; (2) that, under both Florida and federal law, a landowner may assert a facial challenge to a regulation without exhausting administrative remedies; (3) that Section 163.3161(9), Florida Statutes, "evidences the Florida Legislature's intent that relief from adoption and enforcement of allegedly unconstitutional regulatory exaction schemes should be determined in a judicial, not an administrative proceeding;" and (4) that Florida law permits a landowner to accept the propriety of an administrative agency's decision and sue for inverse condemnation in circuit court.

> [W]hether administrative remedies must be exhausted is conceptually distinct . . . from . . . whether an administrative action must be final before it is judicially reviewable.  While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 192-95 & n.13 (1985).  For example, Patsy v. Fla. Bd. of Regents, 457 U.S. 496 (1982), absolves the landowner of an obligation to seek, before asserting a takings claim in federal court, review of a planning commission's final decision.  Williamson County, 473 U.S. at 194 n.13 (citing Patsy and stating that "[e]xhaustion of review procedures is not required.").  However, generally a landowner must first obtain a final decision as to the permissible use of the property.  473 U.S. at 193-94 & n.13 ("[N]o constitutional violation occurs until just compensation has been denied.  The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a [Section] 1983 action."); see also Suitum v. Tahoe Regional Planning Agency,

520 U.S. 725, 737 (1997). Thus, a landowner possesses no obligation to exhaust administrative review procedures before asserting a takings claim pursuant to Section 1983. Section 253.763, Florida Statutes, requires that before seeking judicial review a landowner show only "final action of any agency" (and not "an appeal from 'final action of any agency'"). Bowen v. Fla. Dep't of Envtl. Regulation, 448 So. 2d 566, 568-69 (Fla. 2d DCA 1984). Sections 253.763(2) and 403.90(2), Florida Statutes, provide "for proceeding directly to the circuit court on an inverse condemnation action following final agency action denying, on its merits, a permit application." 448 So. 2d at 568-69; see Fla. Stat. § 253.763(2) ("Any person substantially affected by a final action of any agency with respect to a permit may seek review within 90 days of the rendering of such decision and request monetary relief in the circuit court . . . circuit court review shall be confined solely to determining whether final agency action is an unreasonable exercise of the state's police power constituting a taking without just compensation."). Thus, neither state nor federal law requires the landowner's exhausting administrative remedies, and the state procedure for obtaining compensation is the landowner's seeking judicial review of final agency action.

### *2. Ripeness*

"[T]hough the classic taking is a transfer of property to the [s]tate or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing." See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection, __ S.Ct. __, 2010 WL 2400086, *7 (2010) (Scalia, J.). The law of "regulatory takings 'aims to identify regulatory actions that are functionally equivalent to

a classic taking.'" 2010 WL 2400086 (quoting Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005)). In the case of a regulatory taking, if the "claim arises in . . . a facial challenge rather than in . . . a concrete controversy concerning the effect of a regulation on a specific parcel of land, the only issue is whether the mere enactment of the regulation constitutes a taking." Glisson v. Alachua County, 558 So. 2d 1030, 1035-36 (Fla. 1st DCA 1990) (citing Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470 (1987)). A "'facial' challenge[] to [a] regulation [is] generally ripe the moment the challenged regulation or ordinance is passed, but face[s] an 'uphill battle,' since it is difficult to demonstrate that 'mere enactment' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.'" Suitum, 520 U.S. at 736 n.10 (quoting Keystone, 480 U.S. at 495, and Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 297 (1981) (citations omitted)). Accordingly, a facial challenge to an ordinance becomes ripe upon the ordinance's enactment. However, "if the ordinance is alleged to be unconstitutional only as applied to a particular property, the landowner must apply for a variance or exception before the party can seek judicial review." Cent. Fla. Inv., Inc. v. Orange County Code Enforcement Bd., 790 So. 2d 593, 597 (Fla. 5th DCA 2001); Williamson County, 473 U.S. at 186 (finding that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."); Eide v. Sarasota County, 908 F.2d 716, 720-21 (11th Cir. 1990) ("The rationale for requiring a final decision in the due process takings area is that the court cannot

ascertain whether the regulation has gone "too far" until it can analyze the effect that the zoning decision has had on the value of the property."). Additionally, "if a [s]tate provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure . . . ." Williamson, 473 U.S. at 195.

Another type of regulatory takings claim is a "arbitrary and capricious" claim, in which "a plaintiff . . . argue[s] that the regulation is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid exercise of the police power." Eide, 908 F.2d at 721 & n.10 (noting that, for example, "if a governmental entity has acted arbitrarily and capriciously[,] e.g. because of race[,] in the course of eminent domain proceedings, the fact that just compensation is paid would not undo the arbitrary act, nor cure the constitutional violation."). An "arbitrary and capricious" claim ripens as soon as the government decides "to apply the regulation to the [landowner's] property . . . ." 908 F.2d at 724 n.13 (noting that "a property owner's rights have been violated the moment the government acts in an arbitrary manner and (in an as[-]applied challenge) that arbitrary action is applied to the owner's property.").

In this action, the complaint alleges eight counts, four of which (counts five through eight) assert facial challenges to the County's comprehensive plan policies and Right-of-Way Ordinance. Accordingly, counts five through eight ripened at the moment the County adopted each policy and ordinance. Counts one and two assert as-applied challenges under the Takings Clause of the U.S. Constitution and Section Six of the

Florida Constitution, which section governs eminent domain. Sections 253.763(2) and 403.90(2), Florida Statutes, provide that after "a final action of any agency with respect to a permit" a landowner may seek judicial review. The County questions the finality of the challenged administrative action, because the landowner never sought a variance or a dedication waiver. The landowner asserts that "[i]t would be futile to pursue the administrative remedies purportedly available to [the landowner] under the County's land development regulations," such as a dedication waiver available under Section 319.9 of the Right-of-Way Ordinance. As to the inadequacy of the administrative remedy, the landowner alleges that in order to pursue a remedy available under the Right-of-Way Ordinance:

> a landowner must first prepare and file, at [the landowner's] own expense, an application that includes a costly traffic study, a costly real estate appraisal, costly roadway construction cost estimates[,] and complex, costly proportionate share fee calculations. Thereafter, the landowner is subjected to multiple, costly, time consuming administrative hearings before the County pursuant to which, the County retains the ultimate discretion to approve or deny such relief without payment of full or just compensation. The costs and expenses of such procedures typically exceed $20,000.

Additionally, the landowner alleges that methodology for determining the "excess set aside or dedication and amount of compensation" is both arbitrary and capricious (1) because the methodology "applies different[,] more onerous exaction as compared to similarly situated persons whose property does not lie within [the] corridor and (2) because the methodology "requires that the value of any excess set aside or dedication be determined on a depressed basis without regard to the actual fair market value of the land set aside or dedicated based on its highest and best use." Because

- 11 -

the landowner sufficiently alleges the inadequacy of the administrative remedy, the County's ripeness challenge to counts one and two is unpersuasive.

Counts three and four consist of equal protection and due process claims based on the arbitrary and capricious nature of the dedication required by the County. Specifically, the complaint alleges that the County required the dedication (1) absent a substantial or "demonstrably clear and present" need to widen State Route 52, (2) absent a finding that the landowner's development would "so overburden existing public roads as to require . . . accelerated improvement," (3) even though the County contemplates no widening of State Route 52 in the near future, (4) even though the dedication lacks a rough proportionality to the traffic impact of the proposed development, (5) even though the dedication is "grossly disproportionate" to any impact, and (6) even though the need to widen State Route 52 and the traffic generated by the proposed development lack a reasonable connection. Thus, counts three and four ripened when the County applied the allegedly arbitrary and capricious action to the landowner's property.

### *3. Suspect Class*

The County argues that each equal protection claim merits dismissal, because the landowner fails to either "allege it is part of a suspect or quasi-suspect class and a fundamental right is involved" or allege "that it was treated differently than others similarly situated . . . [,] [that] this different treatment was intentional discrimination[,] and that the [County] had no rational basis for treating [the landowner] differently." The landowner responds (1) that "it is not necessary that an equal protection claimant be a

member of a suspect class" and (2) that the landowner "sufficiently alleges discriminatory intent."

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), recognizes an equal protection claim by a "'class of one'" if "the plaintiff alleges that [the plaintiff] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

> [T]he requirement of discriminatory motive "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." The Supreme Court has explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Factors a court may consider in determining whether state action was motivated by discriminatory animus include: (1) the disparate impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; and (4) the legislative or administrative history.

In re Employment Discrimination Litig. Against State of Ala., 198 F.3d 1305, 1319 (11th Cir. 1999) (Tjoflat, J.) (citations omitted); Conley v. City of Dunedin, Fla., 2009 WL 812061, *11 (M.D. Fla. 2009) (Bucklew, J.).

In this instance, the landowner argues (1) that the landowner is a "class of one" and (2) that the complaint sufficiently alleges discriminatory intent "by showing that the County selected, adopted, applied[,] and re[-]affirmed a regulatory course of conduct having a disparate impact on [the landowner] in order to land bank [the landowner's] property without having to comply with Florida eminent domain laws." Specifically, the complaint alleges (1) that the dedication requirement applies only to landowners with

property in a "right-of-way" corridor, which corridors the County established; (2) that the County exacts the dedication both without payment and without first determining (and in disregard of) the dedication's relationship to the traffic impact of the proposed development; (3) that, in order to seek relief from the dedication, a landowner must comply with "unduly burdensome, costly, unfair, discriminatory[,] and inadequate non-judicial administrative processes . . . with no assurance that [the] landowner will receive adequate compensation for any excess exaction; and (4) that the County required the landowner to dedicate a one-hundred-and-forty-foot right-of-way to accommodate the widening of State Route 52, even though neither a present need nor a future plan exist for the widening of State Route 52 and even though the landowner's development "will not contribute to the need to remedy any future traffic problems on [State Route] 52 anymore than other similarly situated landowners . . . ." Accordingly, based on the alleged disparate impact, historical background, and events leading up to the County's action, the landowner sufficiently alleges discriminatory intent.

### *4. Standing*

Lastly, the County argues that the landowner lacks standing[1] to challenge the constitutionality of the County's "unwritten customs, policies, and practices," because the landowner "voluntarily completed the site plan approval process[] and elected not to challenge, contest[,] or object to the terms of the approval." Ostensibly, because the

---

[1] Standing requires that (1) the plaintiff suffer an actual or imminent injury that is "'concrete and particularized'" and not "'conjectural or hypothetical,'" (2) the injury be "fairly traceable" to the defendant's conduct, and (3) a favorable decision redress the plaintiff's injury. Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 663-64 (1993) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

landowner's "dealings with regard to the 'customs, policies and practices' [and] the County's ordinances[] have been completed," no "bona fide dispute" exists.  However, the landowner's voluntary compliance with the County's regulatory process presents no impediment to standing.  In fact, voluntary compliance is irrelevant.  Because the landowner alleges a concrete, particularized injury fairly traceable to the County's conduct, which injury a favorable decision will redress, the landowner establishes standing.

## Conclusion

Accordingly, the County's motion to dismiss (Doc. 8) is **DENIED**.

ORDERED in Tampa, Florida, on July 30, 2010.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE